UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

———————————————

In re:

JORDAN RIVER RESOURCES, INC., et al.,[1]

        Debtors.

Case No. DL 07-01747
Hon. Scott W. Dales
Chapter 11

_____/

JORDAN RIVER LIQUIDATING TRUST,

        Plaintiff,

Adversary Pro. No. 09-80301

v.

JAY & P, LLC, JAY MERKLE, MACHINE
CONTROL TECHNOLOGY, INC.,
PATRICIA MERKLE, JAY AND PATTY
MERKLE TRUST,  JORDAN MERKLE,
JONATHON MERKLE, GRN, INC.,
PLATINUM INDUSTRIES, and DANIEL
MERKLE,

        Defendants.

_____/

**OPINION AND ORDER**

PRESENT:    HONORABLE SCOTT W. DALES
              United States Bankruptcy Judge

I.  INTRODUCTION AND JURISDICTION

This matter comes before the court upon the Jordan River Liquidating Trust's objection

to the Preferred Interests asserted by Jay and Patricia Merkle, jointly, and the Jay V. and

Patricia J. Merkle Living Trust (the "Merkle Trust").  By the time of trial, the only interests

---

[1] Jointly Administered with Apple Tree Resources, Inc., Case No. 07-02139, Redstone Energy Corporation, Case No. 07-01750, and Superior Petroleum Corporation, Case No. 07-01786.

remaining in dispute were those of Patricia J. Merkle ("Ms. Merkle") individually and as beneficiary of the Merkle Trust.[2]

The court's task is to consider the "Allowed Preferred Interests" that Ms. Merkle asserts and determine whether she may share in distributions under the Debtors' Consolidated Joint Plan of Reorganization dated October 8, 2008 (the "Plan"), which the court confirmed by order dated December 17, 2008 (the "Confirmation Order").

The court has jurisdiction over the Debtors' case and this adversary proceeding[3] pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The court may enter final judgment because the controversy involves claims to a *res* within the court's jurisdiction (permissibly resolved by a bankruptcy judge) rather than a proceeding to augment the estate (presumptively within the purview of a life-tenured district judge with salary protections under Article III of the U.S. Constitution). *See generally Stern v. Marshall*, 131 S. Ct. 2594, 2601 (2011). The court can enter final judgment in this matter, subject to appellate review under 28 U.S.C. § 158, because resolving the Plaintiff's objection to Ms. Merkle's Preferred Interests "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2601.

## II. BURDEN OF PROOF AND EFFECT OF CONFIRMED PLAN

Ms. Merkle recognizes that she has the burden of establishing the validity and nature of her "Preferred Interest" pursuant to the Plan. *See* Plan at § 4.5(d); Trial Transcript (hereinafter

---

[2] Jay V. Merkle ("Jay") and the other defendants named in the caption have withdrawn their interests or otherwise resolved their dispute with the Jordan River Liquidating Trust (the "Liquidating Trust" or "Plaintiff"). Although the Liquidating Trust originally challenged the interests of the Merkle Trust on technical (mostly state law) grounds, the court concludes from the closing briefs and absence of such arguments during the trial that the Liquidating Trust has abandoned that aspect of its objection. Accordingly, because Ms. Merkle is the only beneficiary of the Merkle Trust asserting an interest in the Debtors, the court will treat her and the Merkle Trust as one and the same for purposes of this Opinion, generally referring to Ms. Merkle unless the historical context requires otherwise.

[3] The court previously determined to treat this challenge to the Merkle-related interests as an adversary proceeding rather than a contested matter simply for convenience and to ensure that papers related to the objection would not get lost among the voluminous filings in the Debtors' base case docket.

"Tr.") at pp. 5-6.[4]   More precisely according to the Plan, Ms. Merkle must establish her "Preferred Interest Net Investment," a defined term which means:

> [T]he total Cash investment made by a Preferred Interest Holder on account of such Preferred Interest, less any Cash or other property received by such Preferred Interest Holder or any affiliate of such Preferred Interest Holder before the Confirmation Date (i) on account of or related to such holder's Preferred Interest, including, without limitation, any dividends, profits, interest, or other payments received; or (ii) on account of or related to any referral or finder fees paid to such holder in connection with an investment by another Person in the Preferred Interests or other equity interests of the Debtors or Related Entities.

*See* Plan at § 1.68.  The court regards as significant the fact that the Plan uses the broad phrases "on account of *or related to*" or "in connection with" when referring to *deductions* from a Preferred Interest during the life of the investment, but the more limited phrase "on account of" with respect to the Cash *investment* made to acquire the Preferred Interest initially.  This suggests that the court should more freely allow deductions from the investment than find a qualifying Cash investment in the first place. *Id.*   Similarly, the Plan requires proof of the total "Cash" investment, and defines "Cash" narrowly as "cash and cash equivalents, including but not limited to bank deposits, checks, and other similar items." *Id.* at § 1.14.  Deductions, in contrast, are broadly defined as including "without limitation, any dividends, profits, interest, or other payments received," or "finder fees."  *Id.* at § 1.68.

Therefore, the court concludes that in order to be treated as a "Preferred Interest Holder," *see* Plan § 1.67, Ms. Merkle must establish: (1) the amount of Cash she paid on account of her

---

[4]  Under the Plan, the term "Preferred Interest" means, as to those Debtors or Related Entities that are corporations, the preferred stock of such corporations, and as to those that are limited liability companies, the units of preferred membership interests of such limited liability companies. Promissory notes held by a Longhorn Investor also qualify as "Preferred Interests" but common stock interests do not.  Preferred Interests do not include the Common Interests in the Debtors or related entities. *See* Plan at § 1.66.

interest; and (2) the nature of her interest (*i.e.,* preferred stock rather than common stock or a loan). If the nature of her initial transaction changed over time, she must show how it turned into a Preferred Interest, given the Plan language requiring her to prove that she made a "Cash" investment "on account of" the Preferred Interests she asserts.

In conducting its review of the evidence, the court is mindful that Ms. Merkle is not simply a claimant, but also an "insider," because she is Jay's wife.[5] For a variety of reasons, courts carefully scrutinize an insider's transactions with a debtor. *See, e.g., Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991) ("Insider transactions are more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders "usually have greater opportunities for . . . inequitable conduct."); *In re Alma Energy*, 2010 WL 4736905 (E.D. Ky.) (closer scrutiny is required regarding the claims of someone with a sufficiently closer relationship to the debtor than those dealing at arm's length). Consequently, the court in this proceeding has been careful to balance Ms. Merkle's burden of proof against the stricter scrutiny that insider transactions warrant.

To accomplish this balancing, the court concludes as follows.  First, any subscription agreement for a Preferred Interest, standing alone, is not sufficient to meet Ms. Merkle's burden of proving that she is entitled to share in the benefits accorded a Preferred Interest Holder because she must also prove that she made a Cash investment specifically "on account of" a Preferred Interest. *See* Plan at § 4.5(d). And, because Jay asserted control over the Debtors' books and book-keepers, and his office prepared the subscription agreements, the court will

---

[5] *See* 11 U.S.C. § 101(31) & (45); Tr. at p.16, lines 4-5 and p.90, lines 12-15.

require a direct causal link between Ms. Merkle's status as Preferred Interest Holder and her Cash investment.

Second, in view of the substantive consolidation of the various debtor entities, the court will not require Ms. Merkle to trace her "Cash investment" from one entity to the next because such tracing is not consistent with the Plan and the reasons the Plaintiff and others advanced for confirming a plan premised on substantive consolidation.   Consequently, if Ms. Merkle can prove that she invested "Cash" and did so "on account of" a "Preferred Interest" in any debtor or consolidated entity, the court will regard her as having met her burden of proof as to all post-confirmation debtor entities.   The court, however, does not regard the substantive consolidation of the various entities as relieving Ms. Merkle of her burden to prove her "Preferred Interest Net Investment," a term the court interprets as encompassing the nature of her interest, whether it began as a loan, equity or preferred equity, and the casual relationship between that investment and the acquisition of the Preferred Interest she claims.

For example, if Ms. Merkle's investment began as a loan to or common stock investment in one entity but on the petition date was reflected as a Preferred Interest in the books and records of another, she will have to prove her right to the treatment under the Plan as a Preferred Interest Holder.   Because holders of Allowed Preferred Interests receive a distribution under the Plan before holders of Allowed Common Interests, the court regards this as a fair requirement and one consistent with the Plan. With these principles in mind, the court turns to the daunting task of evaluating the record.

### III. BACKGROUND AND CONTENTIONS OF THE PARTIES

The Liquidating Trust is the creature of the confirmed Plan of Jordan River Resources, Inc., Apple Tree Resources, Inc., Redstone Energy Corporation, and Superior Petroleum

Corporation (the "Debtors"), and other related entities.[6]  *See* Plan at § 6.3(a). The Plaintiff has authority to object to claims or interests under the Plan and, pursuant to that authority, filed its objection to the Preferred Interests of Ms. Merkle and the other Merkle-related entities.

Jay was a shareholder, member, officer, director and manager of the Debtors and related entities, and Ms. Merkle is his wife. Like many other interested parties, the Merkles poured money into the Debtors and the other related entities.

Ms. Merkle claims that the investments she and her husband made came from the couple's joint funds, and that some of these investments were re-titled in the name of the Merkle Trust. Jay, who is now incarcerated in the federal penitentiary for his role in attracting investments in the Debtors, no longer seeks payment but Ms. Merkle continues to seek her half share of the couple's investments, whether held with her husband jointly, individually, or as beneficiary under the Merkle Trust.  More specifically, she asks to be treated as holding an Allowed Preferred Interest under the Plan.

An Allowed Preferred Interest as defined in the Plan means a Preferred Interest for which a proof of preferred interest was timely and properly filed with the court by the bar date, or which is listed in the Investor Cash Investment Report (the "Report") and not disputed. The term also includes a previously Disputed Preferred Interest which the court has allowed. *See* Plan at § 1.4.  Ms. Merkle does not automatically have an Allowed Preferred Interest because her interests are listed as disputed in the Report and Plaintiff has filed an objection.

Because the Debtors and the related entities were treated and operated as a single business enterprise and "assets were freely transferred between the entities without legal

---

[6] The related entities include Delaware River Resources, Inc.; New Star Properties, LLC; Huron Hydrocarbons, LLC; Shelf Exploration and Production LP; Shelf Exploration and Production GP, LLC; Midwest Diversified, LLC; Longhorn Energy Corporation; Petroleum Resource Group, LLC; OK Minerals, LLC; Peach Tree Petroleum, Inc.; Great Lakes Energy Company, LLC; Mesquite Oil & Gas, LLC; and  Southwest Energy Resources, Inc.

formality or adequate consideration," the Plan substantively consolidated the Debtors and the related entities. *See* Plan at § 7.3. Under the Plan, therefore, all assets and liabilities of the Debtors and the related entities are treated as though the entities were merged, and each claim or interest filed in the respective bankruptcies is deemed to be a single obligation of all the Debtors and related entities. *See* Plan at § 7.1. The consolidation is effective as of the Effective Date. *See* Confirmation Order at ¶ 18. Therefore, even though the Plaintiff argues that some of the transactions lacked consideration, Ms. Merkle argues that no consideration is required for any inter-Debtor or related entity transaction due to the substantive consolidation.

The Plaintiff acknowledges that Ms. Merkle engaged in no wrongdoing in connection with the Debtors or the other related entities, but argues that she is an insider by virtue of her marriage to Jay and as such, her claims merit more scrutiny than the average investor. The Plaintiff contends that the Merkle Trust did not acquire or purchase, and the Debtors did not transfer, any Preferred Interest, and that Ms. Merkle did not give any consideration to the Debtors for most of her claimed interests.

In his *de bene esse* deposition taken on April 28, 2010 and submitted as his testimony at trial (Exh. 30), Jay explained that an accounting firm in Wichita Falls, Texas (the "Texas Accountants") tracked all the investments made in the Debtors and the related entities. He further explained that the Texas Accountants would not have recorded an investment on the Debtors' books without first receiving the necessary documentation that an investment had actually been made, such as confirmation that funds were deposited or cash received. The Plaintiff and its own accountants relied on these same books and records to prepare the Report which identifies the net investment for each Preferred Interest. Exh. 41. Relying on the Report and Jay's testimony, Ms. Merkle argues that both she and Jay each had a one-half interest in the following investments:

| Investor | Entity | Investment Amount | Ms. Merkle's Claimed Share |
|---|---|---|---|
| Merkle Trust | Superior Petroleum | $717,309.20[7] | $358,654.60 |
| Merkle Trust | Redstone Energy | $30,401.61 | $15,200.81 |
| Jay and Ms. Merkle | Southwest Energy | $144,264.73 | $72,132.36 |
| Jay and Ms. Merkle | Longhorn Energy | $20,000.00 | $10,000.00 |

The Plaintiff disagrees.

### IV. FINDINGS

The court held a trial on May 23, 2011, in Grand Rapids, Michigan, during which it heard live testimony from three witnesses and admitted fifty-seven exhibits. In her testimony, Ms. Merkle explained that she and Jay wed in 1975, at age eighteen and twenty, respectively. She supported him while he got an associates degree. Soon, Jay started his own business and she looked after their five children. Throughout their entire marriage, they held joint bank accounts, never holding property separately. The Plaintiff offered no evidence to contradict this credible testimony and the court accepts it. Accordingly, the court finds that half of the funds that the Merkles put into the Debtors or related entities belonged to Ms. Merkle.

Rhonda Karney, a certified public accountant, author of the Report, and employee of the liquidating trustee, testified that when investigating the accounting records maintained on behalf of the Debtors and the other related entities by the Texas Accountants, she found no situation where an entry was bogus or made out of whole cloth. *See* Tr. at p. 110. She did, however, find some investments that did not have proper or thorough documentation. Even though Jay denied knowledge of how the Texas Accountants booked investments, Ms. Karney noted that Jay, as

---

[7] Arguably, an additional $10,000.00 related to this investment was located after the Report was filed by the Plaintiff's accountant, and therefore the net amount that Ms. Merkle claims as invested in Superior Petroleum is $717,309.20.

president of the Debtors, was continuously directing the Texas Accountants "where money should be transferred to on various investors." Tr. at p. 194, lines 3-6. Documentary evidence corroborates Ms. Karney's view that Jay played an important role in directing the Texas Accountants' allocation of investments among the Debtors and related entities.

Ms. Karney testified that all investors were allowed to transfer equity investments between entities. She stated that these inter-company transfers were recorded accurately. *See* Tr. p. 111, lines 11-25. Indeed the Plan and the court's Confirmation Order approved this treatment implicitly by substantively consolidating entities, and expressly in the Confirmation Order. *See* Confirmation Order at ¶ 18 (". . . Creditors and Preferred Interest Holders of the Debtors and Related Entities shall be treated as Creditors and Preferred Interest Holders of the one consolidated entity"). Ms. Karney further noted, however, that no investments other than the Merkles' investments arose initially out of a loan or credit transaction. *See* Tr. at p. 154, lines 1-3. The court credits this testimony.

The Plaintiff's accountant refused to assume that the Merkles' investments were properly characterized just because the Debtors' books reflected preferred interests on the petition date, even assuming the Texas Accountants reviewed the ledgers. *See* Tr. at p.195, lines 8-9. The special treatment accorded the Merkles' loan and common stock transactions and Jay's pervasive role in dictating the characterization of investments justified her skepticism. More generally, she concluded that if an investor (including the Merkles) invested money in an entity and there was no promissory note or subscription agreement, the Liquidating Trust would treat the investment as a purchase of common stock. Likewise, if a promissory note corresponded with a contribution, the Liquidating Trust would treat the transaction as a loan. Finally, if a party documented the investment with a contemporaneous subscription agreement and Cash, the transaction qualified

as a purchase of preferred stock. Consequently, when at times she was unable to find subscription agreements for the Merkles in the various entities, she assumed their investments were in the nature of common stock and therefore, under the Plan not entitled to distribution until after full payment to holders of Preferred Interests. *See* Plan at § 4.8. The parties agree that there must be a signed subscription agreement in order for the court to allow a Preferred Interest. The court accepts Ms. Karney's testimony, assumptions, and methodology under the circumstances.

The evidence showed that many of the Merkles' investments started as contributions to one entity, moved from one or more entities, and ultimately came to rest in the last entity in which Ms. Merkle now claims to hold a Preferred Interest. Ms. Merkle's investments took on various forms (common stock, loan, or preferred investment), each of which is discussed under the heading corresponding to the final entity in which Ms. Merkle claims an interest. In reviewing the record, the court is not concerned about the transfer of Ms. Merkle's supposed interests from one entity to another[8] but is instead focused on the changing nature of the interests.

A.      Superior Petroleum Corporation

As noted above, Ms. Merkle claims to hold a Preferred Interest in Superior Petroleum Corporation ("Superior Petroleum") to the extent of $717,309.20. The evidence established that the Merkles borrowed most of the money they ultimately put into the Debtors and related entities, drawing on a home equity loan, credit card advances, and a mortgage on a commercial building held by their company, Jay & P, LLC. Some of their contributions also came from personal savings.

---

[8] After all, the Debtors and related entities seemed to loosely shift investments for many investors.

There are several components of the Merkles' investment in Superior Petroleum, most of which had their roots in transactions with other entities, including Jordan River Resources, Inc. ("JRR"), Delaware River Resources, Inc. ("DRR"), and GRN, Inc. ("GRN").[9]  For reasons not fully explained or documented, these transactions migrated from the original transferee, ultimately coming to rest on the books and records of Superior Petroleum.  During this journey from one entity to the next, some of the transactions changed form along the way, shifting from loans and common stock to preferred investments, without any explanation for the metamorphosis.

1. Transactions Originating With Jordan River Resources, Inc.

Ms. Merkle was able to produce subscription agreements for all monies transferred into JRR, but produced documentary evidence of "Cash" investments in the form of checks for only $91,000.00. Exh. 51.[10]  Nevertheless, in her testimony, Ms. Karney apparently agreed that the Merkles together infused approximately $137,309.20 (net of dividends or other disbursements) in Cash into JRR before transferring the investment on December 3, 2004 from JRR's books to Superior Petroleum's books. *See* Exhs. 38 and M; Tr. at p. 115, lines 6-13. Ms. Merkle also claimed GRN's share of a Preferred Interest in Superior Petroleum, similarly derived from an investment originally in JRR.

At trial, Ms. Merkle produced subscription agreements and documentation of her Cash investments in JRR, but not for the GRN share. Accordingly, although the court will not allow Ms. Merkle to claim a Preferred Interest on account of the undocumented GRN investment in

---

[9] Testimony established that Jay and his brother, Eric, owned GRN and used it as the initial investment vehicle for JRR.

[10] In Exhibit 51, Ms. Karney notes that only $92,000.00 in checks could be verified, but the checks in Exhibits 6 through 9 total only $91,000.00.

JRR, the court finds by a preponderance of the evidence that Ms. Merkle held a Preferred Interest in JRR, which she ultimately transferred to Superior Petroleum's books as a Preferred Interest. Although there is nothing to show that Superior Petroleum gained anything when the transfer of Ms. Merkle's interest in JRR became an interest in Superior Petroleum, the court is not persuaded that this failure of proof should deprive Ms. Merkle of the benefit of her original investment as holder of a Preferred Interest in JRR.  According to the Plan as confirmed, if Ms. Merkle held a Preferred Interest in any of the Debtors or related entities, she will be treated as if she held a Preferred Interest in the consolidated entity.  *See* Confirmation Order at ¶ 18.  In effect, the substantive consolidation of JRR and Superior Petroleum renders the Plaintiff's argument about tracing and inter-company consideration immaterial.  For purposes of distributions under the Plan, intercompany claims and defenses (upon which the Plaintiff seems to rely in challenging Ms. Merkle's transfer) evaporate in light of the legal fiction that there is but one debtor entity. In any event, the Plaintiff has not reconciled this challenge with the fact that for distribution purposes Superior Petroleum and JRR are the same entity.

The court accepts the Plaintiff's determination that the net amount, after deducting dividends, equals $137,309.20.  Consequently, Ms. Merkle, individually or as beneficiary of the Merkle Trust, has an allowed claim of $68,654.60 in Superior Petroleum.

### 2. Transactions Originating With Superior Petroleum Corporation

The next two investments for which Ms. Merkle seeks allowance derive from payments the Merkles made directly to Superior Petroleum, one for $10,000.00 on December 21, 2004, and the other for $60,000.00 on December 30, 2004. Ms. Merkle introduced subscription agreements showing a preferred investment in Superior Petroleum and Cash (in the form of checks) for these

direct investments and the court finds this evidence persuasive. *See* Exhs. 8 and 9. Therefore, the court finds that Ms. Merkle, as beneficiary of the Merkle Trust, has an additional Allowed Preferred Interest in Superior Petroleum on account of these Cash investments in the amount of $35,000.00 —Ms. Merkle's half share of the $70,000.00 that she and her husband invested.

          3. Transactions Originating With Delaware River Resources, Inc.

The next transaction involved a $500,000.00 "investment" that, according to the Merkles, came about when Joseph Blimline ("Blimline") told Jay that a certain investor in DRR wanted to be cashed out of his investment. Blimline claimed that DRR was not liquid enough to cash-out this investor by paying the $500,000.00 he requested, and asked Jay to lend the money to DRR. Blimline and Jay agreed that Jay would receive monthly interest payments of $30,000.00. In response to Blimline's request for a loan, the Merkles borrowed the money from Republic Bank, and granted a mortgage on a commercial building belonging to their company, Jay & P LLC. When they lent the money to DRR, DRR did not execute a promissory note, but the record establishes beyond dispute that the Merkles transferred $500,000.00 by wire into DRR. Exh. 15.

This loan was recorded as a debt to Jay on the books of DRR. *See* Exhs. D and V. Indeed, the record establishes that Jay bargained for a monthly interest rate of 6%, for an annualized rate of 72%, which Ms. Merkle's counsel accurately predicted in his closing argument would catch the court's attention.[11]

Consistent with the characterization of that transaction as a loan, Jay received three $30,000.00 interest payments in 2004 while the loan was on the books of DRR. *See* Exh. V. The

---

[11] The criminal usury rate in Michigan is 25% per annum. *See* M.C.L. § 438.41. Although the court does not decide the issue, it seems likely that if Ms. Merkle had filed a Proof of Claim on account of the $500,000.00 loan, it would have drawn an objection under 11 U.S.C. § 502(b), based upon cases such as *Scalici v. Bank One*, 2005 WL 2291732 (Mich. App.) and *Orzel v. Scott Drug Co.*, 449 Mich. 550 (1995).

loan was then transferred to Shelf Exploration and treated as a liability to Jay on its books. Shelf Exploration had no investors. Finally, Jay caused the DRR-Shelf loan to be transferred to Superior Petroleum, but at the same time he somehow converted it into a preferred investment in the name of the Merkle Trust, complete with a subscription agreement. There was no check or other Cash because presumably it was simply a book entry. Exh. 16. Jay apparently received three more $30,000.00 payments in 2005, while this "investment" was on the books of Superior Petroleum. *See* Exh. 38; Tr. at p. 153, lines 12-25.

Ms. Merkle's claim that this loan to DRR (and for a time, Shelf Exploration) became a preferred investment as opposed to a loan is simply not supported by the evidence.  First, that Superior Petroleum made three interest payments after the loan was transferred from DRR to Shelf then to Superior is inconsistent with the loan's becoming an equity investment on Superior Petroleum's books. Exh. 38. Second, even though the Merkles repeatedly declared that they were and should be treated like every other investor, they were the only investors that created preferred equity investments out of regular payables, Tr. at p. 154, lines 1-8, and were not required to actually produce Cash on account of the supposed equity interest in JRR. *See* Tr. at p. 16, lines 7-16.

This transfer of the so-called investment from DRR's books to Superior Petroleum's books can be distinguished from the transfers from JRR to Superior Petroleum described above because: (1) unlike the DRR transaction, the JRR transaction began as a preferred equity investment; and (2) the Plan directs the court to treat any preferred investment in (or claim against) one entity as a preferred investment in (or claim against) the consolidated entity.  *See* Plan at § 7.1; Confirmation Order at ¶ 18.

Page 15 of 21

The Plan, in contrast, generally[12] does not authorize the court to treat a *claim* against one entity as a *preferred investment* in another, especially given the definition of "Preferred Interest Net Investment" within the Plan and the precise elements of proof prescribed therein.  Moreover, because DRR only issued *common* stock, it could not trade any *preferred* stock for preferred stock in another entity.  Here, the preponderance of the evidence shows, and the parties admit, that this transaction was a loan to DRR, and continued as a loan to Shelf Exploration, because this is what the documents reflect, and also because Shelf Exploration never issued any stock whatsoever. Even Ms. Merkle was at a loss to explain how this transaction came to be an investment in Superior Petroleum after it was a loan to the other entities. At trial the following exchange occurred:

> Q: Do you know how it came from money being wired to Delaware [River Resources] to somehow you have to do a transfer from Shelf and transferring it to Superior?
>
> A: I don't. That would have been done in Texas.

Tr. at p. 13-16. The court is not willing to change the nature of this transaction from a loan in one entity to a purchase of preferred stock in another on the basis of such a flimsy explanation and a subscription agreement executed almost a year after the initial Cash changed hands. *Compare* Exh. 15 *with* Exh. 16.

Ms. Merkle proved she obtained the rights of a creditor against DRR "on account" of a Cash investment, but at most she proved she received a Preferred Interest in Superior Petroleum "on account of" a non-cash receivable—the usurious loan to DRR.  She offered no explanation for how this payable qualifies as "Cash" within the meaning of the Plan, or for that matter how

---

[12] The only exception to this general rule, not applicable here, involves promissory notes held by a "Longhorn Investor." *See, supra*, note 4.

the transaction changed from a loan to a Preferred Interest.  Consequently, the court finds that Ms. Merkle has not met her burden of proof and neither Ms. Merkle nor the Merkle Trust is entitled to claim any portion of the $500,000.00 loan as a Preferred Interest.

4. <u>Transactions Originating With Snake River Resources, Inc.</u>

The next component of the Superior Petroleum transaction started on August 4, 2004, when the Merkles used $100,000.00 to fund a loan they made to Snake River Resources, Inc. ("SRR"). There was no subscription agreement executed at that time evidencing an equity investment and SRR recorded the $100,000.00 transaction on its books as a liability. Without explanation, the loan was then transferred to Superior Petroleum on January 21, 2005, and again without explanation, it appeared on the books of Superior Petroleum as a preferred investment in favor of the Merkle Trust with a subscription agreement but no check or other "Cash" within the meaning of the Plan. When counsel asked Ms. Merkle if she knew how this money went from being an obligation of SRR to a Preferred Interest of Superior Petroleum, again Ms. Merkle offered no explanation. She simply did not know. *See* Tr. at p. 98, lines 3-12.

Therefore, the court disallows the supposed Preferred Interest in Superior Petroleum derived from the $100,000.00 loan to SRR. For many of the reasons set forth above with respect to the $500,000.00 loan to DRR, Ms. Merkle failed to prove any "Cash" investment *on account of* this portion of her alleged Preferred Interest in Superior Petroleum, and therefore failed to establish her "Preferred Interest Net Investment" in this respect.  She proved at most a *loan* to a non-debtor entity, not a Cash investment on account of any Preferred Interest in a Debtor or related entity.

5. <u>Summary of Findings Regarding Superior Petroleum Corporation</u>

In summary, Ms. Merkle has an Allowed Preferred Interest in Superior Petroleum in the amount of $103,654.60 comprised of her direct investment of $35,000.00 in Superior Petroleum in December 2004, and her $68,654.50 in Preferred Interests derived from her investment in JRR.

B.       <u>Redstone Energy Corporation</u>

The Merkles' deposits in Redstone Energy Corporation ("REC") were made directly to REC with checks to evidence the investments. On September 10, 2004, the Merkles invested $10,800.00 (Exh. 20) and executed a subscription agreement on that same date creating a Preferred Interest. On September 14, 2004, they transferred $20,000.00 into REC (Exh. 22) but there is no corresponding subscription agreement to evidence any preferred equity investment on account of that payment. Similarly, on October 5, 2004, they invested another $13,000.00 (Exh. 21) with no subscription agreement.  Ms. Merkle argued that even though documentation is lacking, these transactions should be viewed as the same type of transaction as the September 10, 2004 investment for $10,800.00.  The court, however, is obliged to hold Ms. Merkle to her burden of proof. Because she is an insider and because she and Jay seemed equally inclined to make their contributions in the form of loans or common stock (as opposed to preferred equity), the court is unwilling to draw an inference to the detriment of non-insider holders of Preferred Interests.  Based upon the record, it is equally plausible that the contributions in REC took the form of loans or common stock.

Accordingly, the court finds that Ms. Merkle's total substantiated claim of a Preferred Interest in REC equals $10,800.00. Without a subscription agreement, the other investments are

nothing more than the purchase of common stock.  In addition, on the 15th of each month from February to April 2005, the Merkles received disbursements of $1,466.13, for a total of $4,398.39, which reduces their net investment to $6,401.61.

Consequently, Ms. Merkle has an Allowed Preferred Interest on account of her Cash invested in REC, less distributions, in the net amount of $3,200.80.

C.      Southwest Energy Resources, Inc.

The transaction involving Southwest Energy Resources, Inc. ("SW") started as four separate common stock purchases in DRR by GRN and two common stock purchases by Jay. *See* Exh. J. Although the general ledger of DRR shows a total purchase by GRN of $215,500.00, only $155,500.00 as a Cash investment finds support in the bank statements admitted at trial. *Id.* at pp. 2 and 3.

Earlier in 2003, the ledger shows that Jay made a common stock purchase in DRR of $125,000.00, for a total investment by both Jay and GRN of $340,500.00. On April 30, 2004, this $340,500.00 entry was reclassified as treasury stock and booked as an account payable in favor of GRN, suggesting that SW redeemed common stock in exchange for an undocumented promise to pay for the redemption.  *See* Exh. J. p. 4; Tr. at p. 164, lines 5-18. Then on July 31, 2004, $160,000.00 was reclassified as a payable in favor of Jay, even though it was still listed in the stock account of GRN. *See* Exh. J, p. 4; Tr. at p. 163, lines 9-17. There were no documents to evidence this reclassification or any transfer from GRN to Jay.

Next, $500,000.00 of GRN's total investment in DRR was transferred out of GRN's stock account and into the account of Jay, reclassified as an account payable, and then transferred to Shelf Exploration. The $160,000.00 previously transferred to Jay as a payable was

transferred to SW on September 30, 2004. Exh. J, p. 5; Exh. D. From January 31 to March 31, 2005, Jay Merkle received $15,735.27 in distributions. *See* Exh. P.

Despite this convoluted shuffling, the court draws several conclusions. There is no evidence of any consideration flowing between GRN and Jay, and the substantive consolidation provided under the Plan does not excuse this deficiency in the proofs: GRN is not among the consolidated entities.    Even crediting DRR's general ledger, Jay only initially invested $125,000.00, although this is unsubstantiated by any bank records or checks. For her part, Ms. Merkle did not know how this transaction originated or where the money came from. *See* Tr. at p. 76, lines 21-23. From the records admitted at trial, it appears that the SW transaction started as a purchase of common stock in DRR and then became a payable. Not until it reached SW did it take the form of a preferred investment. Again, the court is unwilling to reclassify a claim as a preferred investment when it appears to be a different kind of transaction.  The transaction began as a loan derived from money invested at least in part by an unrelated entity, was re-labeled as a preferred investment almost a year after money changed hands, and remains unsubstantiated by the presence of a check, Cash, or even Ms. Merkle's direct knowledge.

Consequently, to the extent Ms. Merkle asserts a Preferred Interest with respect to any investment in SW, her interest will be disallowed.

D.    Longhorn Energy Corporation

The Merkles invested $20,000.00 directly into Longhorn Energy Corporation ("LEC") evidenced by a check but no subscription agreement. *See* Exh. 24. As with some of their investments in REC, there is no evidence that the parties intended this investment to be anything but a purchase of common stock. Nor did Ms. Merkle offer any evidence that would permit the

court to treat her as a note-holding Longhorn Investor entitled to treatment as a Preferred Interest Holder under the Plan. *See* Plan at § 1.67. The court finds that Ms. Merkle's transaction with LEC amounts to nothing more than an equity infusion resulting in an undocumented purchase of common stock.

Therefore, the court will disallow Ms. Merkle's supposed Preferred Interest in LEC.

### V. CONCLUSION & ORDER

Given the loose prepetition record-keeping of the Debtors and affiliates and Ms. Merkle's difficulty in locating records which law enforcement authorities may have seized or which may have been lost with the passage of time, the court does not envy the task that Ms. Merkle's capable counsel faced at trial. Nevertheless, the Plan prescribed Ms. Merkle's burden of proof, and the court's rules and pretrial orders afforded her a fair opportunity to discover the information in advance of trial.

In any event, based on the record presented at trial, the court finds that Ms. Merkle and the Merkle Trust have an Allowed Preferred Interest in the consolidated Debtor and related entities summarized as follows:

| Investor | Entity | Allowed Preferred Interest |
| --- | --- | --- |
| Merkle Trust | Superior Petroleum | $103,654.60 |
| Merkle Trust | Redstone Energy | $3,200.80 |
| Jay and Ms. Merkle | Southwest Energy | $0.00 |
| Jay and Ms. Merkle | Longhorn Energy | $0.00 |
| **Total** | | **$106,855.40** |

Accordingly, the court will sustain the Liquidating Trust's objection in part, overrule it in part, and require the Liquidating Trust to recognize Ms. Merkle as holding Allowed Preferred Interests to the extent of $106,855.40.

NOW, THEREFORE, IT IS HEREBY ORDERED that (1) the Plaintiff's objection is SUSTAINED IN PART and OVERRULED IN PART; and (2) the Plaintiff shall treat Ms. Merkle and the Merkle Trust as the holders of Allowed Preferred Interests in the amount of $106,855.40.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Andrew J. Gerdes, Esq. and Jerome D. Frank, Esq.

END OF ORDER

**IT IS SO ORDERED.**



Scott W. Dales
United States Bankruptcy Judge

**Dated: August 16, 2011**